UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

ANTHONY ARTUSO,  )
   Plaintiff )
 )
v. )  COMPLAINT
 )
VERTEX PHARMACEUTICALS, INC., )
   Defendant )

*FILED IN CLERKS OFFICE 2010 MAR 17 A 11: 53 U.S. DISTRICT COURT OF MASS.*

*10 CA 10452 WGY*

### Parties

1. The Plaintiff Anthony Artuso ("the Plaintiff") is an individual currently residing at 55 Westbury Court, Skillman, New Jersey.

2. The Defendant Vertex Pharmaceuticals Inc. ("the Defendant"), upon information and belief, is a business organized and incorporated under the laws of the Commonwealth of Massachusetts. The Defendant, upon information and belief, maintains a principal place of business at 130 Waverly Street, Cambridge, Massachusetts.

### Jurisdiction and Venue

3. This Court has jurisdiction pursuant to 28 U.S.C. 1332 because there exists complete diversity between the Plaintiff and the Defendant, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. Venue is proper in this Court pursuant to 28 U.S.C. 1391(a) because the Defendant's principal place of business is located in this District, and the events giving rise to this Complaint occurred within this District.

### General Allegations

5. The Plaintiff repeats, realleges and incorporates by reference the foregoing allegations.

6. At all times pertinent hereto, the Plaintiff was an established pharmaceutical executive with considerable academic and employment credentials.

7. From 2001-2008, the Plaintiff held positions with the Bristol Myers-Squibb Corporation ("BMS"), a major pharmaceutical company, where he had a track record of strong performance, where he recruited and trained a highly qualified team of professionals, and where he regularly advised top management of the company on key strategy and investment decisions.

8. The Plaintiff's strong performance at BMS led to a series of promotions, culminating in his ascension to the position of Vice President. The Plaintiff's salary, bonus, and restricted stock compensation at BMS exceeded $400,000.00 per annum.

9. In addition to annual compensation, BMS maintained a defined benefit pension plan in which the Plaintiff was vested. Based upon the Plaintiff's salary history at BMS and the benefit accrual and payout formulas of the plan, the Plaintiff's lump sum payout at retirement was increasing in excess of $58,000.00 each year he remained an employee of BMS.

10. In April 2008, the Plaintiff was contacted by Stephen Williams, President of Bench International Search, Inc. ("Bench International"), an executive search firm retained by the Defendant as its exclusive agent to identify qualified candidates for the role of Head of Strategic Planning. Bench International forwarded the Plaintiff a memorandum that contained a description of the position, information about the Defendant and details about its pipeline of drugs in development. That document described the Defendant as "transforming itself to be ready for the challenges and opportunities of developing and commercializing breakthrough drugs for years to come."

11. After discussing the position with Williams, the Plaintiff told him he was not interested in leaving BMS, as he did not want to relocate his family to Massachusetts. Williams subsequently informed the Plaintiff that the Defendant was amenable to an arrangement whereby the Plaintiff would work part of the workweek from New Jersey. The Plaintiff then agreed to meet with key executives of the Defendant.

12. In May 2008, the Plaintiff participated in two rounds of meetings at the Defendant's headquarters in Cambridge, Massachusetts, during which he met with Joshua Boger, Chief Executive Officer ("J. Boger"), Ian Smith, Chief Financial Officer ("Smith"), Peter Mueller, Chief Scientific Officer ("Mueller"), Ken Boger, General Counsel ("K. Boger"), Lisa Kelly-Croswell, Senior Vice President and Head of Human Resources ("Kelly-Croswell"), and twice with Kurt Graves, Chief Commercial Officer and Executive Vice President for Corporate and Strategic Development ("Graves"), to whom the Plaintiff would report. These executives emphasized the Defendant's plans to commercialize telaprevir for the treatment of hepatitis C, and emerge as a successful company with capabilities stretching from research through marketing. These executives also extolled the Defendant's ongoing efforts to recruit highly talented individuals from outside the company to achieve these goals.

13. The Plaintiff's two meetings with Graves included discussions of the Defendant's plans to implement a new model for commercializing telaprevir, to continue to pursue new acquisitions and licensing to secure and augment the Defendant's long term growth, and to evaluate and pursue international expansion opportunities. In response to specific questions from the Plaintiff, Graves assured the Plaintiff that the position for which he was being recruited would play a central role in planning and implementing these long term corporate development activities.

14. In early June 2008, the Plaintiff was informed by Bench International that the Defendant was preparing an employment offer, and requested that the Plaintiff provide detailed information a about his BMS salary, bonus, equity compensation, and pension benefits. The Plaintiff complied with this request.

15. Approximately one week later, Lisa Anderson ("Anderson"), Director of Strategic Staffing for the Defendant, presented the Defendant's initial employment offer to the Plaintiff via telephone call. The Plaintiff expressed dissatisfaction with this offer, indicating it did not take into account the cost the Plaintiff would incur in maintaining an apartment in Boston, and did not fully compensate him for the BMS restricted stock and stock option awards and pension accrual benefits the Plaintiff would forego upon leaving BMS.

16. In a follow-up phone call with Anderson, the Plaintiff discussed these concerns about stock and pension. During that call, the Plaintiff outlined in detail the BMS pension accrual and payout formulas, as well as the amounts and terms of the restricted stock and stock option awards that had been granted to him by BMS. The Plaintiff maintained that the compensation offered by the Defendant did not take into account these elements of his BMS compensation and benefit package. Anderson responded that Vertex provided its employees with valuable stock options in lieu of pension benefits. She assured him that given the prospects for appreciation in the Defendant's stock price, the stock options and restricted stock awards included in the Defendant's employment offer were of substantially greater value than the pension benefit accruals and equity awards the Plaintiff would forfeit upon leaving BMS.

17. The next day, the Plaintiff received a phone call from Graves to discuss the employment offer. The Plaintiff indicated that he was not inclined to accept the Defendant's offer since it did not appear to provide sufficient professional and financial benefits to justify leaving his position with BMS, particularly the BMS restricted stock and stock option awards and pension accrual benefits he would forego. Graves emphasized that the Plaintiff was viewed by the Defendant as a "critical hire" who would contribute significantly to the Defendant's emergence as a profitable and rapidly growing pharmaceutical company. Graves indicated that promotional opportunities would be available to the Plaintiff after six to twelve months of strong work performance. Graves also assured the Plaintiff that over the next several years, the Plaintiff would have numerous additional opportunities for professional advancement, as the Defendant continued to expand its commercial capabilities and geographic presence.

18. Graves then spoke about the compensation being offered the Plaintiff. Graves indicated that the value of equity awards being offered could be expected to increase substantially if Phase III trials for telaprevir confirmed the very promising results that were seen in Phase II. Graves emphasized that the Defendant had already initiated preparations for the launch of telaprevir, and was pursuing acquisitions and licensing agreements for new drugs to ensure the Defendant's continued growth.

19. The Plaintiff responded that to compensate him for the vesting of equity awards and continued accrual of pension benefits he would forego if he left BMS, the Defendant would need to increase the number of stock options awarded as part of the employment offer from 15,000 to 25,000. The Plaintiff made this request after completing a detailed analysis of the value of an initial award of 25,000 stock options, and the expected value of subsequent annual stock option and restricted stock awards given continued progress of telaprevir as a major advance for the treatment of hepatitis C.

20. Shortly thereafter, Graves telephoned the Plaintiff and informed him that the Defendant would indeed increase the number of stock options included in the employment offer to 25,000. Graves again emphasized the long term benefits, both financial and professional, that would be available to the Plaintiff if he accepted the Defendant's employment offer. The Plaintiff requested to have the weekend to consider the revised offer.

21. On or about June 23, 2008, the Defendant tendered the Plaintiff a written employment contract. The contract, reflecting the foregoing employment negotiations, stipulated that the Plaintiff would receive "Start-up Equity" in the form of "a non-qualified stock option" of 25,000 shares, which would "vest in 16 quarterly installments over the years." These Stock Options were not contingent upon the Plaintiff's continued employment with the Defendant or any other circumstance. In contrast, the contract provided that the Plaintiff would receive 3,000 "Restricted Shares," which would vest on the anniversary of the employment start date "for as long as [the Plaintiff] remained employed by [the Defendant]." The contract stipulated that the Restricted Shares, unlike the Stock Option, "that have not been vested at the end of your employment will be forfeited." The contract also provided for an annual target bonus of 30% of the Plaintiff's annual base salary.

22. On June 28, 2008 the Plaintiff accepted the Defendant's revised employment offer. In reaching this decision, the Plaintiff relied upon the Defendant's assurances he was being offered long-term employment and would realize significant value from the initial and subsequent equity awards from the Defendant, given expected performance by the Plaintiff and the continued successful development of telaprevir.

23. During his first six months on the job, the Plaintiff coordinated preparation of briefing materials for the Defendant's October 2008 board meeting, developed a plan for managing investment decisions and uncertain revenue streams in 2009 (which was

approved by the Defendant's Board at its December 2008 meeting), and gained approval from an executive committee consisting of J. Boger, Graves, Smith, and Mueller for implementing a new, more integrated corporate planning process in 2009.

24. In January 2009, as part of the Defendant's annual performance review process, the Plaintiff received the highest level of individual performance rating. Graves informed the Plaintiff that that commendation was the first time in his twenty year career in the pharmaceutical industry that he had given any of his direct reports a top performance rating after one year on the job.

25. In February 2009, the Plaintiff was awarded an additional 18,500 stock options, 2,500 restricted stock units, a bonus, and a salary increase, all of which were significantly in excess of target amounts for his position, due to the outstanding performance evaluation the Plaintiff received.

26. In March 2009, the Defendant completed a $400 million acquisition of Virochem, a Canadian pharmaceutical company with a portfolio of drug candidates for the treatment of Hepatitis C. The acquisition gave the Defendant access to a highly promising Phase II polymerase inhibitor, which if successfully developed in combination with the Defendant's hepatitis C protease inhibitir, telaprevir, or with other targeted anti-viral agents, would provide a further advance in the treatment of Hepatitis C and extend the Defendant's leadership position in that market.

27. By Spring 2009, in accordance with the corporate planning process, and a staffing plan approved by Graves, the Plaintiff had recruited four director level staff to provide the Defendant with new capabilities for strategic planning, portfolio management, business and competitive intelligence, and decision support for development program planning. All of these newly recruited staff had substantial expertise in one or more of the functions described above, and significant professional experience with major pharmaceutical companies and/or highly regarded strategy consulting firms

28. In May 2009, Matthew Emmens ("Emmens") was appointed Chief Executive Officer; J. Boger remained a director of the company, but was no longer involved in the day to day management of the firm.

29. From May 2009 through July 2009, the Plaintiff was responsible for coordinating preparation of key briefing materials outlining corporate goals and objectives, long term financial projections, and evaluations of additional growth opportunities. In July 2009, the Plaintiff presented key sections of these corporate strategy briefing materials to the Board of Directors at its annual corporate strategy retreat.

30. The Plaintiff also directed an internal valuation of the company, which was presented at the July 2009 retreat by Graves and Smith and estimated the risk-adjusted per share valuation substantially greater than the Defendant's then current stock price. Most of the added value was attributable to compounds in the Defendant's pipeline other than

telaprevir, which had not yet become a focus for external investors. The valuation analysis also underscored that positive results in several trials of the Defendant's drug candidates, scheduled to be completed in 2010, could be expected to result in another substantial increase in the value of the company.

31. The investment banking firm, Goldman Sachs ("Goldman") had been engaged by the Defendant to perform an independent valuation analysis, which was also presented to the Defendant's Board of Directors at the July 2009 corporate strategy retreat and approximated the Plaintiff's valuation. Goldman likewise noted that new clinical data on the Defendant's Phase II and Phase III drug candidates would become available in 2010, and that positive results would result in further increases in the Defendant's stock price and valuation.

32. After the conclusion of the July 2009 retreat, several members of the Board informed the Plaintiff that his presentation was the most productive and informative strategy review they had attended in over ten years. In subsequent meetings over the next several weeks, Emmens, Graves, Smith, and Kelly-Croswell also commended the Plaintiff for excellent work in support of the July 2009 Board retreat.

33. At the end of July 2009, the Plaintiff received a very strong mid-year performance review from Graves, who informed the Plaintiff that he would soon be given additional responsibilities, together with a recommendation for promotion.

34. From August 2009 through the end of September 2009, the Plaintiff and his staff directed a comprehensive analysis of the Defendant's research and development portfolio, including a quantitative assessment of investment options and tradeoffs across the portfolio. The final product was highly praised by Graves, Smith, and Mueller, and formed the basis for the Defendant's 2010 budget planning and research and development investment decisions.

35. In late September 2009, Graves and Mueller unveiled a set of organizational changes intended to improve coordination and decision-making across the commercial and research and development functions of the company. As part of those changes, the Plaintiff was given additional responsibilities, and five staff members were transferred to his department.

36. On September 30, 2009, the Plaintiff was informed that Graves had resigned his position with the Defendant. The Plaintiff and all of Graves' former direct reports were informed by Emmens that they would report directly to him until further notice.

37. After Graves' resignation, the Plaintiff and his staff prepared key briefing materials that were presented at the Defendant's October 2009 Board of Directors meeting. In e-mail messages from Emmens and Smith, the Plaintiff was commended for excellent work that contributed to another successful Board meeting.

38. The Plaintiff also took responsibility for ensuring that the new Franchise Review Committee ("FRC"), which was the centerpiece of the organizational changes recently announced by Graves and Mueller, was properly established and functioning. Mueller commended the Plaintiff for taking leadership in coordinating the FRC meetings and asked the Plaintiff to take responsibility for additional activities related to management of the Defendant's research and development programs.

39. Public records filed by the Defendant indicate that at the October 2009 Board meeting, key executives of the Defendant, including Smith, Mueller, K. Boger, Kelly-Croswell, and Amit Sachdev, Senior Vice President for Public Affairs, were each awarded between 30,000 and 300,000 additional stock options, with accelerated vesting tied to the filing and launch of telaprevir.

40. At the annual meeting of the American Association for the Study of Liver Disease ("AASLD"), held in Boston at the end of October 2009 and the beginning of November 2009, the Defendant presented promising new clinical data on telaprevir, its Phase III drug candidate for treatment of Hepatitis C. Immediately after the data became public at the AASLD meeting, the Defendant's stock price rose sharply, increasing by nearly 30% relative to the stock price at the time the options were awarded.

41. On December 1, 2009, while on vacation at his home in New Jersey, the Plaintiff received a phone call from Smith and Kelly-Croswell. They informed the Plaintiff that his staff would be disbursed across three departments, and his position would be eliminated, effective December 4, 2009. Smith and Kelly-Croswell advised the Plaintiff that the decision to eliminate his position "was not in any way" based upon the Plaintiff's performance. Later that day, when Smith announced the changes to the Plaintiff's staff, he again stated that the termination of the Plaintiff's employment was not related to performance.

42. The Defendant thereafter refused to pay, pro rata, the 30% target bonus included in the Plaintiff's compensation package, even though the Plaintiff had worked for the Defendant for more than 11 months of 2009, and had received excellent performance reviews. The Defendant also refused to honor the scheduled issuance of the balance of the 25,000 "Start-up Equity" stock options, the vesting for which was not tethered to the Plaintiff's continued employment.

43. Throughout the time period relevant to this Complaint, the Defendant's drug candidates have continued to advance and show very promising results in clinical trials. Final Phase III data for telaprevir are expected to be available mid-year 2010, and the Defendant is expected to submit a New Drug Application ("NDA") for telaprevir to the U.S. Food and Drug Administration ("FDA") by the end of 2010. In addition, the Defendant's first in-class drugs for the treatment of Cystic Fibrosis, VX-770 and VX-809, were advanced into Phase III and Phase II trials respectively. Phase III data for VX-770 are expected to be available in the second half of 2010. In addition, in 2009, the Defendant initiated planning for a Phase II trial for its Jak3

inhibitor for the treatment of auto-immune diseases including rheumatoid arthritis and psoriasis, and for a Phase II trial of VX-765 for treatment resistant epilepsy. Recruitment for these two trials began in the first quarter of 2010 and data from the trials are expected to be available in the fourth quarter of 2010.

44. Throughout the time period relevant to this Complaint, the Defendant continued to rapidly hire new staff, and at the time of the Plaintiff's termination had plans to continue to do so.

45. During the time period relevant to this Complaint the Defendant repeatedly demonstrated the ability to access capital markets to finance its operations. In the days immediately after the Plaintiff was informed his position would be eliminated, the Defendant raised over $500 million through a stock offering.

46. The Defendant proactively recruited the Plaintiff and persuaded him to leave a highly compensated position with a stable company based upon assurances of long term employment and the financial gain associated with the equity awards being offered. Those assurances were predicated only on the Plaintiff's expected performance, and the continued progress of the Defendant's drug candidates, circumstances which were realized. The Plaintiff's discharge resulted in a deprivation of compensation to the Plaintiff for past services and a windfall to the Defendant.

## Count I
## Negligent Misrepresentation

47. The Plaintiff repeats, realleges and incorporates by reference the foregoing allegations.

48. The Defendant negligently made false statements of material fact to the Plaintiff, to wit, that the Plaintiff's employment with the Defendant would be long term, so that the Plaintiff would be in a position to realize the value he and the Defendant ascribed to the stock options and restricted shares the Defendant used to induce him to leave BMS.

49. The Plaintiff reasonably relied on these false statements to his detriment.

50. The Plaintiff sustained damages as a result.

WHEREFORE, the Plaintiff Anthony Artuso respectfully requests that this Honorable Court award judgment against the Defendant for appropriate damages, together with attorney's fees and costs.

## Count II
## Intentional Misrepresentation

51. The Plaintiff repeats, realleges and incorporates by reference the foregoing allegations.

52. The Defendant intentionally made false statements of material fact to the Plaintiff, to wit, that the Plaintiff's employment with the Defendant would be long term, so that the Plaintiff would be in a position to realize the value he and the Defendant ascribed to the stock options and restricted shares the Defendant used to induce him to leave BMS.

53. The Plaintiff reasonably relied on these false statements to his detriment.

54. The Defendant knew, or should have known, that the Plaintiff would reasonably rely on these false statements.

55. The Plaintiff sustained damages as a result.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court award judgment against the Defendant for appropriate damages, together with attorney's fees and costs.

## Count III
## Promissory Estoppel

56. The Plaintiff repeats, realleges and incorporates by reference the foregoing allegations.

57. The Defendant made promises which it should reasonably have expected to induce action or forbearance of a definite and substantial character by the Plaintiff, to wit, that the Plaintiff's employment with the Defendant would be long term, so that the Plaintiff would be in a position to realize the value he and the Defendant ascribed to the stock options and restricted shares the Defendant used to induce him to leave BMS.

58. The Plaintiff reasonably relied on the promises of the Defendant to his detriment.

59. Injustice can be avoided only by enforcement of the promises.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court award judgment against the Defendant for appropriate damages, together with attorney's fees and costs.

## Count IV
## Breach of Contract

60. The Plaintiff repeats, realleges and incorporates by reference the foregoing allegations.

61. The Plaintiff and the Defendant entered into a valid and binding employment contract supported by good and adequate consideration.

62. The Plaintiff, at all time pertinent hereto, performed his obligations and honored his covenants under the contract.

63. The Defendant breached the contract by failing to perform its obligations and honor its covenants under the contract, to wit, refusing to pay the Plaintiff, pro rata, the 30% target bonus included in the Plaintiff's compensation package, even though the Plaintiff had worked for the Defendant for more than 11 months of 2009, and had received excellent performance reviews, refusing to honor the scheduled issuance of the balance of the 25,000 "Start-up Equity" stock options, the vesting for which was not tethered to the Plaintiff's continued employment, and discharging the Plaintiff before he could realize the value of the restricted shares the Defendant used to induce him to leave BMS.

64. The Plaintiff sustained damages as a result.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court award judgment against the Defendant for appropriate damages, together with attorney's fees and costs.

### Count V
### Breach of Implied Covenant of Good Faith and Fair Dealing

65. The Plaintiff repeats, realleges and incorporates by reference the foregoing allegations.

66. The employment contract between the Plaintiff and the Defendant was subject to the implied covenant of good faith and fair dealing.

67. The Defendant terminated the Plaintiff in bad faith.

68. The Defendant breached the implied covenant of good faith and fair dealing.

69. The Plaintiff sustained damages as a result.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court award judgment against the Defendant for appropriate damages, together with attorney's fees and costs.

THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE

The Plaintiff,
by his Attorney,

David W. Krumsiek (BBO # 564564)
Lauren M. Burke (BBO # 670840)
Perry, Krumsiek & Jack, LLP
101 Arch Street, 19th Floor
Boston, MA  02110
Tel (617) 720-4300
Fax (617) 720-4310

Dated:  March 16, 2010